AES/DCP:KTF/HM
F. #2019R0810

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -

JOHN DEMARR,

              Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

**To Be Filed Under Seal**

21-MJ-128 (CLP)

COMPLAINT AND AFFIDAVIT IN
SUPPORT OF APPLICATION FOR
ARREST WARRANT

(18 U.S.C. § 371)

EASTERN DISTRICT OF NEW YORK, SS:

        JAMES KIM, being duly sworn, deposes and states that he is a Special Agent with the Internal Revenue Service, duly appointed according to law and acting as such.

        Upon information and belief, from in or about and between November 2017 and May 2018, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant JOHN DEMARR, together with others, did knowingly and willfully conspire to use and employ manipulative and deceptive devices and contrivances, contrary to Rule 10b-5 of the Rules and Regulations of the United States Securities and Exchange Commission, Title 17, Code of Federal Regulations, Section 240.10b-5, by: (i) employing devices, schemes and artifices to defraud; (ii) making one or more untrue statements of material fact and omitting to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (iii) engaging in acts, practices and courses of business which would and did operate as a fraud and deceit upon one or more investors and potential

investors in Start Options and B2G, in connection with the purchase and sale of investments in Start Options and B2G, directly and indirectly, by use of means and instrumentalities of interstate commerce and the mails, contrary to Title 15, United States Code, Sections 78j(b) and 78ff.  In furtherance of the conspiracy and to effect its objects, within the Eastern District of New York and elsewhere, the defendant JOHN DEMARR, together with others, committed and caused to be committed overt acts as described herein.

(Title 18, United States Code, Sections 371 and 3551 et seq.)

## INTRODUCTION

The source of your deponent's information and the grounds for his belief are as follows:

1. I am a Special Agent ("SA") with the Internal Revenue Service-Criminal Investigation ("IRS-CI") in the Los Angeles Field Office, and have served in this capacity for approximately twelve years.  As part of my training as an SA, I attended the Federal Law Enforcement Training Center in Glynco, Georgia, where I received training in criminal and financial investigative techniques with an emphasis in accounting and criminal tax law.  My training included courses in law enforcement techniques, federal criminal statutes, criminal investigations, execution of search warrants, financial investigative techniques, and legal principles and statutes related to criminal violations of Titles 18, 26, and 31 of the United States Code.  I received a Bachelor's degree in Business Administration with an emphasis in Accounting from California State University, Long Beach.  I have personally conducted and assisted in investigations of criminal violations of the Internal Revenue Code, the Bank Secrecy Act and the Money Laundering Control Act, as

well as other financial crimes such as wire fraud. These investigations have involved the use of electronic and physical surveillance; informants and cooperating witnesses; undercover operations; and the preparation and execution of search and arrest warrants. I have consulted with other experienced senior investigators concerning the methods and practices of individuals engaged in crimes such as the preparation of false income tax returns, income tax evasion, wire fraud and money laundering. Prior to my current position, I was a Revenue Agent with the Internal Revenue Service Small Business and Self-Employed Division for approximately three years.

2. I am familiar with the facts and circumstances set forth below from, among other things: (a) my personal participation in this investigation, (b) discussions with other law enforcement agents involved in this investigation, and (c) my review of marketing materials, recordings, bank records and interviews of individuals.

3. Except as explicitly set forth below, I have not distinguished in this affidavit between facts of which I have personal knowledge and facts I learned from other law enforcement agents. Because this affidavit is being submitted for the limited purpose of establishing probable cause to arrest the defendant, I have not set forth each and every fact learned during the course of the investigation described below. Instead, I have set forth only those facts that I believe are necessary to establish probable cause for the arrest warrant sought herein. In addition, where the contents of documents or the actions, statements and conversations of others are reported herein, they are reported in sum and substance and in part.

## PROBABLE CAUSE

I. **Relevant Terms and Definitions**

4. A "virtual currency," also known as a "cryptocurrency," was a currency circulated over the Internet as a form of value. Virtual currencies were not issued by any government, bank, or company, but were controlled through computer software operating via cryptographic technology and a large decentralized, peer-to-peer network. Cryptocurrencies maintained ledgers, which tracked the amount of each cryptocurrency held by any given user. Within that network, users could conduct cryptocurrency transactions amongst themselves in a secure, traceable manner.

5. A "virtual currency exchange," also known as a "cryptocurrency exchange," was a business that functioned to allow customers to purchase, sell or trade virtual currencies, including for other forms of value, such as conventional fiat money (e.g., U.S. dollars, Russian rubles, euros). Exchanges could be brick-and-mortar businesses (exchanging traditional payment methods and virtual currencies) or online businesses (exchanging electronically transferred money and virtual currencies).

6. A "cryptocurrency wallet," also known as a "digital wallet," was an application that allowed cryptocurrency users to store and retrieve their digital assets. Digital wallets could hold multiple cryptocurrencies. Each digital wallet had a unique cryptographic address, which was used to facilitate transactions.

7. "Mining" was a process by which individuals on cryptocurrency networks could help authenticate cryptocurrency transactions. In exchange for

authenticating transactions, an individual's ledger could be credited with newly created cryptocurrency. Only certain cryptocurrencies had the ability to be mined.

8. A "cryptocurrency token" was a digital asset that unlike a cryptocurrency, did not have its own network, but could be used on other cryptocurrency networks for virtual goods or services. Cryptocurrency tokens were usually created, distributed, sold, and circulated through the initial coin offering process.

9. An initial coin offering ("ICO") was a way for companies that developed and maintained cryptocurrencies to raise funds. In an ICO, a cryptocurrency company would sell interested investors a new cryptocurrency token in exchange for funds to grow the company. ICOs were usually marketed to investors using a "technical whitepaper," which was a document that included a detailed description of the cryptocurrency product, the product's technical solution, how the product would be developed and details on sale of the token.

10. Bitcoin was one form of cryptocurrency, which was created in 2009 and was the world's largest cryptocurrency by market capitalization.

## II. **Relevant Entities**

11. "Bitcoiin" was a company formed in or about February 2018 by Individual-1 that purported to offer cryptocurrency and related investments through its website and social media. Bitcoiin used a name similar to the cryptocurrency Bitcoin and made false claims about its product to induce investments. On its now-defunct website, Bitcoiin claimed to create a "self-sustaining cryptocurrency" called "Bitcoiin2Gen" or

6

"B2G." Bitcoiin claimed that B2G was part of a virtual currency "ecosystem" which included a "mining ecosystem (Dragon Mining Tech), and a crypto-wallet (B2G wallet)."

12. Bitcoiin had previously done business under different corporate names, including the name "Start Options" in or about the fall of 2017. Start Options and the website www.startoptions.com (the "Start Options Website"), were founded by Individual-1. Start Options purported to be an online investment platform that provided cryptocurrency mining, trading and digital asset trading services.

### III. The Defendant and Relevant Co-Conspirators

13. The defendant JOHN DEMARR was an American citizen who was a resident of California. DEMARR worked as a private detective since 1988, and ran his own private investigations firm in California called John A. Demarr PI – Investigation Services. DEMARR was a promoter of several digital asset-related companies, including Start Options and B2G. DEMARR was identified to investors of Start Options and B2G as the "Director of North American Operations."

14. Co-Conspirator 1 ("CC-1"), an individual whose identity is known to the affiant, was an American citizen who was a resident of Nevada. CC-1 previously worked as an attorney in California, but resigned CC-1's license to practice while facing disciplinary charges in 2011. CC-1, acting primarily at the direction of the defendant JOHN DEMARR, also served as a ghostwriter of press releases, technical whitepapers and website content for a number of digital asset-related companies, including B2G.

15. Co-Conspirator 2 ("CC-2"), an individual whose identity is known to the affiant, was an American citizen who was a resident of California. CC-2 worked as a

private investigator and for a property management company based in the Midwest, and previously served as a police officer. CC-2 worked with the defendant JOHN DEMARR in connection with Start Options and B2G, and primarily assisted DEMARR with the collection and distribution of funds and signing up investors. CC-2 held him/herself out to investors and prospective investors as the Chief Compliance Officer of B2G, although CC-2 had no legal or compliance experience.

16. Individual-1 was a Serbian-Australian national who resided in the Philippines. In connection with the schemes described below, Individual-1 used the alias "Felix Logan," and "Felix Logan" purported to be the Chief Financial Officer of Start Options.

17. "Sasha Bjelov" was a pseudonym for a foreign individual who assisted Individual-1 with the schemes described below. "Sasha Bjelov" purported to act as the assistant for "Felix Logan."

### IV. The Start Options Scheme

18. In or about November 2017, the defendant JOHN DEMARR agreed with Individual-1, who was using the name "Felix Logan," to promote and market Start Options in the United States in exchange for commissions based on the value of investments made by those investors whom DEMARR recruited. DEMARR worked at the direction of Individual-1 to attract U.S. investors in Start Options, including investors in the Eastern District of New York.

19. In approximately December 2017, the defendant JOHN DEMARR, together with others, began offering securities in the form of investment contracts through

the Start Options Website.   Start Options was marketed in the United States and worldwide by promoters using the Start Options Website, letters, e-mails and social media (the "Start Options Marketing Materials").   The Start Options investment contracts were available for purchase by individuals in the United States and worldwide through the Start Options Website, and investments were accepted either in Bitcoin, or in U.S. dollars or Euros payable through credit card or bank wires.   To participate, investors had to deposit their funds for a specified contract period—60 or 90 days—after which they could purportedly withdraw their money at a significant profit.

20. The Start Options Marketing Materials falsely claimed that investor funds would be invested in digital asset mining and digital asset trading platforms that would earn them a guaranteed profit after a certain number of days.   In reality, Start Options investors' money was never invested in any vehicles, and, in any event, Start Options could not truthfully guarantee a profit as it purported to do in the Start Options Marketing Materials.

21. The defendant JOHN DEMARR was alerted as early as December 2017 that Start Options was not a legitimate business.   On or about December 18, 2017, a Start Options promoter sent DEMARR an email that copied portions of a blog post written by a Start Options investor entitled "UPDATE ON THE STARTOPTIONS.COM SCAM!"   The blog post described, in sum and substance, how Start Options was not operating out of its purported address in the Philippines and was "not a real business."   Later that day, DEMARR forwarded the email to Individual-1 and wrote, "See below- we need to fix this or this guy will hurt us!   Call me."

22. One way that investors in the United States would invest in Start Options was by emailing the defendant JOHN DEMARR their names, addresses and credit card information, after which DEMARR and CC-2 would process the investors' credit cards, and the money would go to a bank account controlled by DEMARR. For example, on or about February 8, 2018, a U.S. investor who resided in the Eastern District of New York ("Investor 1," an individual whose identity is known to the affiant) emailed DEMARR his or her American Express card information and a copy of his or her driver's license. DEMARR forwarded that email to CC-2 and stated, "$1000.00 for Start Options."

23. In or about approximately December 2017, Start Options began receiving substantial Bitcoin inflows from investors to a digital wallet controlled by Individual-1. In or about and between December 1, 2017 and January 26, 2018, investors sent approximately $2.9 million worth of Bitcoin and another cryptocurrency to that digital wallet and to an account controlled by Individual-1 at a cryptocurrency exchange. Investors, the majority of whom were based in the United States (including ones located in the Eastern District of New York), also sent approximately $1.3 million in U.S. dollars to a bank account controlled by the defendant JOHN DEMARR in the United States during the same period.

24. Beginning in or about late 2017 through early 2018, investors could track their Start Options investments through a personal account page on the Start Options Website. Beginning in or about January 2018, investors in Start Options had difficulty accessing the personal account page as well as redeeming their Start Options investments. When there were issues with investors' accounts, the defendant JOHN DEMARR would forward investors' emails to Individual-1 or "Sasha Bjelov."

## V.      **The B2G Scheme**

### A.     The Mandatory Start Options Rollover Into B2G

25.     In or about late January 2018, as Start Options investors tried to redeem their investments following the requisite 60- or 90-day time period, Start Options investors were not permitted to withdraw money and were instead forced to roll over their accounts into an unregistered "initial coin offering" of B2G tokens to be issued by Bitcoiin2Gen, which was described to investors as the "next generation of Bitcoin" (the "B2G Offering").

26.     Specifically, Start Options, at the direction of Individual-1, posted to its website and emailed investors about an "opportunity" to take place in a "Special Buy-Out Offer" that would only be available for a limited time.  Start Options offered to "buy out your unpaid account, for its full value in USD" if the investor deposited one-third of their remaining value in "Start Options.com's new Bitcoiin (B2G) fund.  Or, in the alternative, deposit one-third . . . of whatever balance you want to move across to B2G.  This deposit will earn profits, and can be withdrawn 90 days after deposit."  Start Options promised to match the amount deposited and set it aside in a separate mining account for 90 days, after which it could be "withdrawn freely."  All of the funds – both deposited and matching – would purportedly be converted to B2G at the time of deposit, and "[o]nce matured at plus-90 days, your account can be sold on private or open exchange systems."

27.     Although this buy-out offer was pitched as optional, all of the Start Options investors were required to take part in this "opportunity."  All Start Options investors' accounts were rolled into new B2G accounts.  Even those Start Options investors who tried to decline the "opportunity" were unable to cash in their shares, which were rolled into B2G

accounts. These new B2G accounts listed the purported value of Start Options' investors' accounts in B2G tokens, rather than the other tokens that Start Options was purportedly mining.

### B. The Fraudulent B2G ICO

28. In or about February 2018, Bitcoiin conducted an ICO of B2G, which was open to the general public and allowed investors to purchase B2G tokens. Investors were told that they could purchase B2G tokens using U.S. dollars, Euros, Bitcoins or other cryptocurrencies, and that they could earn commissions by recruiting others to purchase B2G tokens.

### i. The False B2G Marketing Materials

29. The defendant JOHN DEMARR, together with CC-1 and others, drafted portions of the marketing materials for B2G that were circulated to potential investors (the "B2G Marketing Materials"). Many statements contained within the B2G Marketing Materials were false. For example:

(a) DEMARR and his co-conspirators told investors that the ICO would raise capital for B2G to build an "ecosystem" that would allow users to trade B2G tokens, digital currencies and fiat currencies, all "on a secure, comprehensive platform." The B2G technical whitepapers (the "Whitepapers") that Bitcoiin distributed to potential investors, posted on Bitcoiin's website and linked to from its social media accounts, detailed many of the allegedly key features of the B2G ecosystem. In reality, CC-1, at DEMARR's direction, had fabricated most of the detailed information about Bitcoiin in the Whitepapers by plagiarizing similar whitepapers for another cryptocurrency company that had a

successful ICO in 2013.  CC-1 also falsely attributed the authorship of the Whitepapers to a fake individual named "John Sebastian Williams," who was purportedly a Bitcoiin employee.

(b)     CC-1 drafted false press releases at the direction of DEMARR, and attributed them to the same fake Bitcoiin employee, "John Williams," who allegedly authored the Whitepapers.  These press releases and other marketing materials included fraudulent misrepresentations about the success of the B2G offering, the project investors, related technology platforms, the nature of the investment and the project principals.

(c)     The B2G Marketing Materials falsely told investors that two entities, "Dragon Mining" and "Thorex," would contribute to B2G's success.  The B2G Marketing Materials stated that Dragon Mining was supplying 10,000 mining machines to support B2G and develop mining pools[1], and claimed that Thorex would serve as an "in house crypto-exchange" that would permit investors to liquidate and trade B2G tokens following the ICO.  However, Dragon Mining and Thorex were entirely fictitious entities created by Individual-1 with the assistance of DEMARR and CC-1.  CC-1 drafted false press releases for Dragon Mining that were posted on Dragon Mining's website and contained fabricated content that CC-1 plagiarized from other mining hardware websites. At DEMARR's direction, CC-1 created Thorex's website in approximately January 2018, using content CC-1 plagiarized from websites for other digital asset programs.

---

[1] In a "mining pool," cryptocurrency miners share their processing power over a network and split their mining rewards pro rata based on the amount of work they contributed.

(d)     Bitcoiin employed individuals as promoters who marketed the B2G ICO based on false information.   For example, a famous actor served as a promoter and celebrity spokesperson for the B2G ICO (the "Celebrity Spokesperson," an individual whose identity is known to the affiant).   In connection with the ICO, the Celebrity Spokesperson falsely claimed on social media that B2G could generate an 8000% return for investors within one year.   The Celebrity Spokesperson also falsely claimed that B2G was a "mineable coin."   In reality, B2G was not a mineable cryptocurrency.   The Celebrity Spokesperson also falsely claimed he or she was a "participant" in the ICO, a misrepresentation that DEMARR repeated to other investors in press releases and on webinars to induce them to invest in the B2G ICO.   In fact, the Celebrity Spokesperson never invested in the B2G ICO and only served as a paid promoter.

      ii.     The Disposition of Investor Funds

      30.     As with Start Options, investors sent money to the defendant JOHN DEMARR to purchase B2G tokens.   For example, on or about March 12, 2018, Investor 1 wired $15,000 from Jamaica, New York, which is located in the Eastern District of New York, to a bank account controlled by DEMARR, with the memo line "TO JOHN DE MARR FOR BIG [sic] COINS."   As another example, on or about March 29, 2018, a different U.S. investor residing in the Eastern District of New York ("Investor 2," an individual whose identity is known to the affiant), emailed DEMARR with the subject line "New Deposits for B2G."   This email contained information about investments of two other individuals that were being routed through Investor 2.   The email stated in part, "Hi John,

here are 2 deposits one of 10k for new acct. and 500.00 for additional deposit for current acct. . . . Enclosed see attachment deposit receipt."

31.     Investors in the B2G ICO never actually received any digital tokens and funds from the offering were not used to develop the B2G platform.   Instead, investors received fabricated account statements that falsely represented that their money had been invested in B2G tokens and that their investments were earning enormous returns.   In reality, virtually all of the proceeds of the B2G ICO were used to make payments to the principals of Bitcoiin, including the defendant JOHN DEMARR.

C.     The Aftermath of the B2G ICO

32.     In or about late March 2018, Bitcoiin announced that it was becoming "truly open source" and would become a "genuinely anonymous cryptocurrency with no individual or individuals having control over the entity."   As a result, the company announced that the founders, including Individual-1, and the Celebrity Spokesperson were exiting the company.

33.     Following that announcement, many investors sought to withdraw their investments from B2G, but they were either discouraged or prevented from doing so by the defendant JOHN DEMARR.   To discourage investors from withdrawing their funds, DEMARR and others sent investors e-mails with purported reasons to delay the withdrawals, such as technical difficulties with the websites.   Investors who persisted in seeking to withdraw funds were either told that their requests were denied, or never received their funds.   Similarly, investors who tried to recover their promised commissions from B2G mining referrals were denied commissions or told there would be no commissions.   In or

about and between March 2018 and April 2018, DEMARR sent emails to "Sasha Bjelov" and others that described complaints from investors who were unable to withdraw funds from B2G.

34.   In or about late April 2018, Individual-1 disappeared with approximately $7 million in investor funds from the sale of B2G and Start Options that Individual-1 had received through the defendant JOHN DEMARR.   At that time, Individual-1 stopped responding to all communications.   A press release issued by Start Options claimed that the company had been sold to Russian venture capitalists.   Despite the fact that DEMARR knew that Individual-1 had left with investor funds and that Bitcoiin was collapsing, DEMARR never informed investors of this information and instead falsely insisted to investors that B2G tokens would soon be listed on major digital asset platforms.

35.   In or about May 2018, the defendant JOHN DEMARR began collecting B2G tokens from disgruntled investors to allegedly conduct a "bulk sale," which DEMARR claimed was a way to get money back from the B2G principals, including Individual-1, within several days.   Investors began transferring B2G tokens they thought they owned to DEMARR, with the expectation that DEMARR would return their original investment funds shortly.   When the investors never received their funds, the investors began to demand payment from DEMARR, who told the investors that the "bulk sale" of B2G tokens could not take place until the end of the month.

36.   In or about late May 2018, the defendant JOHN DEMARR told some B2G investors that DEMARR was flying to Hong Kong to conduct the "bulk sale."   Instead,

DEMARR flew to Podgorica, Montenegro, where he understood Individual-1, "Sasha Bjelov" and other individuals working with Individual-1 were located.

37.     Rather than face the disgruntled B2G investors, the defendant JOHN DEMARR staged his own disappearance and communicated the fake disappearance to B2G's investors, including investors located in the Eastern District of New York, through CC-1 and others.   DEMARR instructed CC-1 to release statements asserting that DEMARR had been assaulted and went missing in Montenegro, and telling B2G investors to stop attempting to contact DEMARR or his family regarding their inability to have their investment in B2G returned.   CC-2 also released statements about DEMARR's alleged disappearance.   On or about May 25, 2018, CC-2 e-mailed certain B2G investors claiming that DEMARR had landed in Montenegro with purportedly $25 million worth of B2G tokens in a private account, but had been attacked in Montenegro and the tokens had been stolen out of the account.   After CC-2 released these statements, DEMARR ceased contact with investors.

38.     Since his alleged disappearance, the defendant JOHN DEMARR has resided, at least in part, in California.   DEMARR used investor funds from Start Options and B2G to purchase, among other things, jewelry and luxury vehicles such as a Porsche, and to remodel his home in California.

39.     B2G investors were ultimately told by CC-1 and CC-2 that the account with the B2G tokens had been zeroed out and that the funds had been lost.   To date, known victims have reported losses that total over $4 million.

40. In furtherance of the conspiracy and to effect its objects, within the Eastern District of New York and elsewhere, the defendant JOHN DEMARR, together with others, did commit and cause the commission of, among others, the following:

OVERT ACTS

(a) On or about December 18, 2017, after receiving an email from a Start Options promoter that copied portions of a blog post describing how Start Options was a "scam," DEMARR forwarded the email to Individual-1 and wrote, "See below- we need to fix this or this guy will hurt us!   Call me."

(b) In or about January 2018, at DEMARR's direction, CC-1 drafted one or more false press releases for Dragon Mining that were posted on Dragon Mining's website, which contained fabricated content that CC-1 plagiarized from other mining hardware websites.

(c) In or about January 2018, at DEMARR's direction, CC-1 included fabricated information about Bitcoiin in Whitepapers by plagiarizing similar whitepapers for other cryptocurrency companies.   CC-1 also attributed the authorship of the Whitepapers to a fake individual named "John Sebastian Williams," who was purportedly a Bitcoiin employee.

(d) On or about February 8, 2018, Investor 1, who resided in the Eastern District of New York, emailed DEMARR his or her American Express card information and a copy of his or her driver's license.   DEMARR forwarded that email to CC-2 and stated, "$1000.00 for Start Options."

(e) On or about March 12, 2018, DEMARR instructed Investor 1 to wire $15,000 from Jamaica, New York to a bank account controlled by DEMARR. The wire transfer contained the memo line "TO JOHN DE MARR FOR BIG [sic] COINS."

(f) In or about May 2018, DEMARR instructed CC-1 to release statements—which were conveyed to investors located in the Eastern District of New York—asserting that DEMARR had been assaulted and went missing in Montenegro, and telling B2G investors to stop attempting to contact DEMARR or DEMARR's family regarding their inability to have their investment in B2G returned.

WHEREFORE, your deponent respectfully requests that the defendant JOHN DEMARR be dealt with according to law. Because public filing of this document could result in a risk of flight by the defendant JOHN DEMARR, as well as jeopardize the government's ongoing investigation, your deponent respectfully requests that this complaint, as well as the arrest warrant issued in connection with this complaint, be filed under seal.

JAMES KIM
Special Agent, Internal Revenue Service

Sworn to before me by telephone
this 29 day of January, 2021

THE HONORABLE CHERYL L. POLLAK
CHIEF UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK